**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

KANAWAY SEAFOODS, INC., et al.,

             Plaintiffs,

      v.

PACIFIC PREDATOR, et al.,

             Defendants.

Case No. 3:22-cv-00027-SLG-KFR

### REPORT & RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT RE CONVERSION, INTENTIONAL INTERFERENCE, AND ALASKA UTPA COUNTERCLAIMS

Before the Court is a Motion for Summary Judgment re Counterclaims for Conversion, Intentional Interference, and Violation of Alaska Unfair Trade Practices Act ("Motion"), filed by Plaintiffs/Counterdefendants Kanaway Seafoods Inc., doing business as Alaska General Seafoods ("AGS"), and Liberty Packing LLC ("Liberty").[1]  Defendants/Counterclaimants Pacific Predator, Bryan Howey, Dana Howey, and Alaska Wild Exports LLC ("AWE") filed a response in opposition to the Motion,[2] to which Plaintiffs filed a reply.[3]  The Court finds that there are genuine issues of material fact that preclude summary judgment on Defendants' conversion counterclaim, but that no genuine issues of material fact exist and Plaintiffs are entitled to judgment as a matter of law on Defendants' (1) intentional interference with prospective economic advantage and (2) Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA") counterclaims.  Accordingly, the Court recommends that the Motion be **GRANTED in part** and **DENIED in part** and that the Seventh and Tenth Causes of Action in Defendants' Counterclaim be **DISMISSED.**

//

---

[1] Docket 148.  For the sake of simplicity, the Court will refer to these parties as "Plaintiffs."
[2] Docket 163.  The Court will refer to these parties as "Defendants."
[3] Docket 171.

## I. BACKGROUND

### A. Facts

Starting in 2019, Defendants entered into a series of agreements with Plaintiffs. First, on April 17, 2019, the Howeys entered into a loan and security agreement with Liberty ("Liberty Loan Agreement"); the parties documented the $800,000 loan by a promissory note ("Liberty Note") reciting the loan's terms.[4] In exchange for this loan, the Howeys agreed to enter into a fishing agreement to deliver and sell seafood products to AGS for a fixed period.[5] Second, on June 30, 2019, Bryan Howey entered into a promissory note with AGS ("AGS Note") for a loan from AGS to Howey in the amount of $23,949.32.[6] And third, between 2019 and 2021, AGS also loaned or advanced Bryan Howey and the Pacific Predator ("the Vessel")—a 58-foot seiner that the Howeys used to commercially fish Alaskan waters—additional funds that were used to pay various expenses associated with Defendants' fishing operations.[7] These sums were added to an "open account" with AGS that was used to track ongoing debits and credits, including credits for Defendants' fish deliveries.[8]

### 1. The Howeys' default on the Liberty loan

The Liberty Loan Agreement and Note included terms that set forth how payments would be made on the loan and that required the Howeys to meet certain obligations. First, the Liberty Note provided that the Howeys were to pay off the loan in 15 annual installments, due to Liberty each year on September 30 starting in 2019.[9] The parties agreed that "[a]ll payments . . . other than Fishing Proceeds Payments, [would] be made in immediately available funds: (a) by wire transfer to [Liberty]; or (b) by check payable to [Liberty] . . . or (c) out of funds owed to [the Howeys] for [fish deliveries] as provided in Section 4(A)" of the Liberty Note.[10] Section 4(A) of the Liberty Note, titled "Fishing Proceeds Payments," provided that

---

[4] Docket 145-1; Docket 145-2.
[5] Docket 145-1 at 1; Docket 172-1.
[6] Docket 64-3.
[7] Docket 64 at 6–7, ¶ 3.13; Docket 75 at 9–10, ¶ 26.
[8] Docket 64-4; Docket 75 at 9, ¶ 26.
[9] Docket 145-2 at 2, ¶ 4.
[10] *Id.*

R&R on Pls.' MSJ re Counterclaims                    2
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR    Document 193    Filed 08/16/24    Page 2 of 21

"[25%] of the gross proceeds from [any fish delivery] . . . [would] be deducted from any payment due to [the Howeys] for such delivery and applied to the [Liberty Loan] Payments due."[11]

Second, the Liberty Note required the Howeys to "immediately register the Vessel in Washington and maintain that registration . . . during the [loan] term."[12] In addition to requiring the Vessel's registration in Washington, the Liberty Note required the Howeys in the registration documents to identify themselves as the Vessel's registered owner and Liberty as the Vessel's legal owner.[13]

The Liberty Loan Agreement and Note provided that any failure to make a full annual payment or to "perform any of [the Howeys'] obligations" under the Loan Agreement— including the obligation to "properly register" the Vessel—would constitute a default on the loan.[14] Under the Liberty Note, in the event of a default the full amount of the loan would be immediately due and payable, and Liberty could pursue all remedies available.[15]

The Howeys remained current on the Liberty loan until 2021. On August 31, 2019, after accounting for Defendants' fish credits, AGS transferred $72,150.76 to Liberty to satisfy the Howeys' first payment on the Liberty loan.[16] In 2020, no loan payment was made, but the nonpayment was excused because Liberty granted and the Howeys exercised a one-time loan payment deferral due to the effects of COVID-19 on fisheries and fishers.[17] In 2021, no loan payment was made by the September 30 due date and Liberty declared a default.[18] Also in 2021, after a court judgment for damages was issued against Bryan Howey in a separate case, Howey amended the Vessel's registration to replace his name with AWE's as the registered owner.[19]

---

[11] *Id.*
[12] Docket 145-1 at 6, ¶ 6.
[13] *Id.*
[14] *Id.* at 6, ¶ 7.
[15] *Id.* at 3–4, ¶ 7; Docket 145-1 at 6.
[16] Docket 64-4 at 2; Docket 145 at 3, ¶ 4.
[17] Docket 145 at 3, ¶ 5.
[18] *Id.* at 3–4, ¶¶ 6–7.
[19] Docket 172-2 at 3–4.

R&R on Pls.' MSJ re Counterclaims                    3
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR    Document 193    Filed 08/16/24    Page 3 of 21

## 2. Repair of the Howeys' skiff

In 2019, the Howeys asked AGS to help fix a "minor overheating issue" in the engine of the skiff used by the Vessel in seining operations.[20] AGS assigned its port mechanic to repair the skiff.[21] According to Defendants, soon after the port mechanic handed the skiff back over to them, the engine "threw a rod and blew a hole in the top of the block."[22] The parties arranged for AGS to repair or replace the skiff's engine.[23] According to Defendants, the mechanic who AGS hired to perform this task "completely dismantle[d] or disassemble[d]" the skiff without Defendants' authorization.[24] In addition, Defendants contend that AGS promised to install a "remanufactured" engine for the repair, but that the engine that was actually installed was not remanufactured and was instead a "running take out" engine made of "old used parts."[25] According to Defendants, AGS charged them a total of over $20,000 for the engine, unnecessary parts, and labor for the repair.[26]

## 3. Bait herring fishing

From 2017 to 2019, one source of the Howeys' income was bait herring fishing during the winter season.[27] In each of those years, the Howeys engaged in the open area bait herring fishery in Southeast Alaska and delivered their catch to Sitka Sound Seafoods ("Sitka Sound") for processing and shipment to a bait wholesaler.[28] The Howeys fished under bait herring permits issued to Bryan Howey.[29]

In 2021, the Howeys were interested in harvesting bait herring again to supplement their income.[30] At this point, Sitka Sound and AGS had become corporate affiliates.[31] AGS

---

[20] Docket 75 at 12, ¶ 37.
[21] *Id.* at 12, ¶ 38.
[22] *Id.* at 12, ¶ 39.
[23] *Id.* at 13, ¶¶ 41–42.
[24] *Id.* at 13–14, ¶¶ 43–44.
[25] *Id.* at 16, ¶ 56.
[26] *Id.* at 14, ¶ 48.
[27] *Id.* at 17–18, ¶ 61; Docket 151 at 2, ¶ 5.
[28] Docket 75 at 18, ¶¶ 62–63; Docket 151 at 2, ¶ 5.
[29] Docket 164 at 2, ¶ 4; Docket 164-2 at 1–3.
[30] *See* Docket 75 at 19, ¶ 66.
[31] *Id.*; Docket 151 at 3, ¶ 8.

R&R on Pls.' MSJ re Counterclaims          4
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR     Document 193     Filed 08/16/24     Page 4 of 21

communicated with Sitka Sound about the possibility of the Howeys delivering bait herring to Sitka Sound that year for processing.[32]  However, Sitka Sound did not reciprocate the Howeys' interest in working together because the bait herring the Howeys had delivered in 2019 were "underweight and very poor quality."[33]  As a result, the Howeys did not engage in the open area bait herring fishery in 2021.

However, Brad Haynes—another AGS fisher—obtained a bait herring permit in 2021 and Sitka Sound accepted and processed his bait herring deliveries that year.[34]  Like the Howeys, Haynes had a long-term loan with Liberty and an open account with AGS and was struggling to manage these debts.[35]  In May 2020, AGS had internal discussions regarding these struggles and the "immediate threat" of AGS's competitors attempting to poach Haynes and his family's boats.[36]

## B.  Procedural History

In February 2022, Plaintiffs filed a Complaint *in rem* and *in personam* against Defendants, alleging that Defendants failed to comply with the terms of each of their loans with Plaintiffs: the $800,000 Liberty loan, the $23,949.32 AGS loan, and the AGS open account loan for ongoing expenses.[37]  In September 2022, Plaintiffs filed an Amended Complaint.[38]  The Amended Complaint contains claims for breach of contract and promissory note, foreclosure of maritime and state law liens, and corporate disregard.[39]  Defendants filed an Answer and Countercomplaint in which they asserted numerous counterclaims, including for (1) conversion, (2) intentional interference with a prospective economic advantage, and (3) violation of the Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA").[40]

---

[32] Docket 151 at 3, ¶ 9.
[33] *Id.* at 3, ¶¶ 7, 9. Docket 75 at 19, ¶ 66.
[34] Docket 164 at 2, ¶ 4; *see also* Docket 163 at 9.
[35] Docket 156-2 at 1–3.
[36] *Id.* at 1.
[37] Docket 1.
[38] Docket 64.3
[39] *Id.*
[40] Docket 75 at 25–27, 29, ¶¶ 93–103, 113.

R&R on Pls.' MSJ re Counterclaims                    5
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR      Document 193      Filed 08/16/24      Page 5 of 21

In the Motion, Plaintiffs seek summary judgment on each of these three counterclaims.[41]  In support of the Motion, Plaintiffs submit declarations by (1) Leauri Moore, an Officer and Vice President of AGS,[42] (2) William Grant, Plant Manager of Sitka Sound,[43] and (3) Plaintiffs' attorney, with various attached exhibits including excerpts from the transcript of a deposition of Bryan Howey.[44]  Defendants filed a response in opposition to the Motion.[45]  In support of their response, Defendants rely primarily on two declarations by their attorney with attached exhibits pertaining to bait herring fishing.[46]

## II.  LEGAL STANDARDS

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[47]  A fact is "material" if it might affect the outcome of the case under the governing law.[48]  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable fact-finder to decide in favor of the nonmoving party.[49]  In determining whether a genuine dispute of material fact exists, the court views the evidence in the light most favorable to the nonmoving party, and draws all reasonable inferences in favor of that party.[50]

The party moving for summary judgment bears both (1) the ultimate burden of persuasion on the motion and (2) the initial burden of producing evidence that shows the absence of a genuine issue of material fact.[51]  To satisfy its initial burden of production, a moving party that will not have the burden of persuasion at trial "must either produce evidence

---

[41] Docket 148; Docket 171.

[42] Docket 150.

[43] Docket 151.

[44] Docket 149; Docket 149-1–2; Docket 172; Docket 172-1; Docket 172-2.

[45] Docket 163.

[46] Docket 156; Docket 156-1; Docket 156-2; Docket 164; Docket 164-1; Docket 164-2; *see also* Docket 163 at 4–5.

[47] Fed. R. Civ. P. 56(a).

[48] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[49] *Id.* at 248.

[50] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

[51] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

R&R on Pls.' MSJ re Counterclaims                                6
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR    Document 193    Filed 08/16/24    Page 6 of 21

negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."[52]  If a moving party successfully carries this burden, the nonmoving party "must produce evidence to support its claim or defense."[53]  It is not the task of the court to "scour the record in search of a genuine issue of triable fact."[54]  Rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment."[55]  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."[56]

Supplemental jurisdiction allows a district court that has jurisdiction over a federal claim to hear related claims over which it would otherwise lack jurisdiction.[57]  When, as here, a district court hears state law claims based on supplemental jurisdiction, the court applies state substantive law to the state law claims.[58]

## III.  DISCUSSION

### A.  Plaintiffs Are Not Entitled to Summary Judgment on Defendants' Conversion Counterclaim.

"Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."[59]  Under Alaska law, a conversion claim has four elements: "(1) that [the plaintiff] had a possessory interest in the property; (2) that the defendant

---

[52] *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

[53] *Id.* at 1103.

[54] *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins.*, 55 F.3d 247, 251 (7th Cir. 1995)).

[55] *Id.* (quoting *Richards*, 55 F.3d at 251).

[56] *Nissan Fire & Marine Ins.*, 210 F.3d at 1102.

[57] *See* 28 U.S.C. § 1367(a).

[58] *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011).  Although parties to a contract may include a choice-of-law provision in the contract, any such provision does not govern tort claims.  *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407–08 (9th Cir. 1992).  Thus, although the various loan documents in this case provide for the application of Washington law when interpreting and construing these documents, Washington law does not apply to the counterclaims at issue here.  *See* Docket 145-1 at 9; Docket 172-1 at 3; Docket 64-3 at 2.

[59] *Societe Financial, LLC v. MJ Corp.*, 542 P.3d 1159, 1169 (Alaska 2024) (quoting *Silvers v. Silvers*, 999 P.2d 786, 793 (Alaska 2000)).

R&R on Pls.' MSJ re Counterclaims                                            7
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR     Document 193     Filed 08/16/24     Page 7 of 21

interfered with the plaintiff's right to possess the property; (3) that the defendant intended to interfere with [the] plaintiff's possession; and (4) that the defendant's act was the legal cause of the plaintiff's loss of the property."[60]  The plaintiff bears the burden of proof for each element.[61]

Defendants allege in their Counterclomplaint that AGS committed conversion by using fish credits in the open account to make an "excessive payment" to Liberty, to pay "AGS' own agents who damaged [Defendants'] skiff," and to pay for other costs associated with repairs to the skiff.[62]  Defendants suggest that the skiff-related debts belonged solely to AGS and its "own agents and third-party vendors."[63]

Plaintiffs contend that Defendants' conversion counterclaim fails as a matter of law because Defendants cannot demonstrate that (1) Bryan Howey had a possessory interest in the fish credits and payments delivered to AGS for purposes of debt repayment, or that (2) Plaintiffs intended to interfere with any such interest, to the extent one existed.[64]  Plaintiffs maintain that, due to their status as lenders and creditors, they were entitled to apply payments as they saw fit, and the AGS and Liberty Notes made clear that Plaintiffs "intended to be reimbursed for costs associated with any open account of Mr. Howey's including advances."[65]  And in any event, Plaintiffs argue, "misapplication of credits" does not amount to a deprivation of any right to possess these funds.[66]

Defendants respond that the Court's disposition of Plaintiffs' argument is governed by its previous findings that a genuine issue of material fact exists as to the interpretation of the AGS and Liberty Notes, and as to the operation of the AGS open account.[67]  Defendants further contest Plaintiffs' assertion that there is no evidence that Plaintiffs intended to deprive

---

[60] *Id.* (quoting *Silvers*, 999 P.2d at 793).
[61] *Id.*
[62] Docket 75 at 25, ¶¶ 93, 95.
[63] *Id.* at 25, ¶ 94.
[64] Docket 148 at 14.
[65] *Id.* at 14–15.
[66] *Id.* at 16; *see also* Docket 171 at 8 (arguing that "a creditor repaying a debt from credits [does not] show[] an intent to deprive a debtor of their property").
[67] Docket 163 at 6; *see also* Docket 115.

R&R on Pls.' MSJ re Counterclaims                    8
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR      Document 193      Filed 08/16/24      Page 8 of 21

Defendants of a possessory interest, arguing that "Plaintiffs['] entire purpose in this litigation is to deprive Defendants of their funds."[68]

The Court finds that there is a genuine issue of material fact as to whether Defendants had a possessory interest in any of the funds that AGS transferred to Liberty in August 2019. Defendants' entitlement to such a possessory interest depends on whether AGS needed and received express authorization from the Howeys to transfer the entire Liberty loan payment for the 2019 calendar year, given that the transferred sum exceeded the amount that—under the Liberty Note—could be automatically "deducted from any payment due to [the Howeys] for [fish] deliver[ies] and applied to the Payments due for that calendar year."[69] When Defendants brought their motion for summary judgment earlier in this case, the Court determined that there was a genuine issue of material fact as to whether AGS's $72,150.76 debit of the open account in August 2019 was an "unauthorized overpayment" based on the Liberty Note's ambiguous provisions regarding payments.[70] It is clear that the parties still dispute whether AGS needed or actually received the Howeys' authorization to perform this specific debit.[71] Until the propriety of the August 2019 transfer is resolved, the Court cannot determine whether the Howeys had a possessory interest in any of those transferred funds. Plaintiff's reliance on the proposition that a lender may generally apply a debtor's payments to any part of the debt owed to that lender does not resolve the issue here, where the Howeys owed debts to two separate lenders, one of which transferred funds to satisfy the Howeys' annual loan obligation to the other.

The Court similarly finds that there is a genuine issue of material fact as to AGS's intent in making the August 2019 transfer to Liberty. Conversion does not require fault or knowledge of a superior possessory interest.[72] "For the purposes of conversion, '[t]he intention required is an intention merely to exercise a dominion or control over the chattel which in fact seriously

---

[68] Docket 163 at 6–7.
[69] *See* Docket 145-2 at 2, ¶ 4.
[70] Docket 115 at 11–13.
[71] *See* Docket 148 at 15–16; Docket 163 at 5–6; *see also* Docket 75 at 10, ¶ 29; Docket 79 at 4, ¶ 6.
[72] *Societe Financial, LLC*, 542 P.3d at 1170.

1    interferes with the right of another to control it.'"[73]  If AGS's August 2019 transfer was not

2    authorized and the Howeys had a possessory interest in some of the transferred funds, then

3    Liberty's knowing receipt of the disputed funds is sufficient proof of intent to obtain a

4    permanent right of ownership in those funds.[74]

5         In addition, the Court finds that Plaintiffs' proffered evidence does not negate the

6    possessory interest element of Defendants' conversion counterclaim premised on AGS's

7    application of fish credits toward skiff-related costs.  Plaintiffs reference portions of the AGS

8    and Liberty Notes that purportedly show that "both Liberty and AGS intended to be

9    reimbursed for costs associated with any open account of Mr. Howey's including advances."[75]

10   However, these documents do not get at the heart of Defendants' counterclaim, which appears

11   to be whether AGS properly sought reimbursement from fish credits for costs associated with

12   damage that AGS allegedly caused to Defendants' skiff (as opposed to whether AGS properly

13   sought reimbursement from fish credits for costs as a general matter).  Defendants' theory

14   appears to be that AGS alone was responsible for these particular costs, so AGS's use of

15   Defendants' fish credits to pay for these costs interfered with a possessory right that

16   Defendants otherwise might have had in these funds.[76]  Given the parties' factual dispute over

17   the balance on the Open Account at all relevant times, and the lack of evidence offered to

18   support any understanding of the parties with respect to allowable costs on the open account,

19   the Court is unable to conclude that Defendants did not have a possessory interest in fish

20   credits that AGS applied toward the disputed skiff-related costs.[77]

21        The Court therefore recommends denial of Plaintiffs' motion for summary judgment

22   on Defendants' conversion counterclaim.

23   _____

24   [73] *Id.* at 1171 (quoting RESTATEMENT (SECOND) OF TORTS § 224 cmt. c (AM. L. INST. 1965)).
     [74] *See id.* at 1171 n.62 ("Summary judgment can be based on [the defendant's] receipt of the disputed

25   deposits alone . . . ." (citing RESTATEMENT (SECOND) OF TORTS § 229 cmt. e (AM. L. INST. 1965))
     (explaining that "one receiving a chattel from a third person with intent to acquire a proprietary interest

26   in it is liable without a demand for its return by the person entitled to possession"))).
     [75] Docket 148 at 15–16.

27   [76] Docket 75 at 14, ¶¶ 46–48.
     [77] Consequently, the Court is also unable to conclude that AGS lacked the requisite intent to deprive

28   Defendants of any possessory interest that they had in these disputed funds.

     R&R on Pls.' MSJ re Counterclaims                    10
     *Kanaway Seafoods, Inc. v. Pacific Predator*

**B. Plaintiffs Are Entitled to Summary Judgment on Defendants' Intentional Interference Counterclaim.**

Under Alaska law, the tort of intentional interference with prospective economic advantage protects "a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, . . . from a third person's wrongful conduct which is intended to disrupt the relationship."[78] To prove a claim for intentional interference with prospective economic advantage, a plaintiff must show:

> (1) an existing prospective business relationship between it and a third party; (2) defendant's knowledge of the relationship and intent to prevent its fruition; (3) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (4) conduct of the defendant interfering with the prospective relationship; (5) damages caused by the defendant; and (6) absence of privilege or justification for the defendant's conduct.[79]

Defendants allege in their Countercomplaint that Plaintiffs intentionally interfered with the Howeys' prospective relationship with the wholesaler to whom they sold bait herring.[80] Defendants allege that from 2017 to 2019, the Howeys arranged to sell bait herring to this wholesaler and separately entered into agreements with Sitka Sound for processing of the bait herring and shipment to the wholesaler.[81] Defendants allege that in 2021, "[a]fter Sitka Sound . . . came under the AGS corporate ownership umbrella," Sitka Sound refused to process or ship bait herring for the Howeys.[82] According to Defendants, that year AGS "contacted the wholesaler directly," used AGS's own boats to fish for bait herring, and processed and shipped the bait herring from AGS's Kodiak plant, all with knowledge of the Howeys' relationship with the wholesaler and with Sitka Sound.[83]

Plaintiffs assert that Defendants' intentional interference counterclaim fails as a matter

---

[78] *Ellis v. City of Valdez*, 686 P.2d 700, 707 (Alaska 1984).

[79] *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 717 (Alaska 2003).

[80] Docket 75 at 17–20, ¶¶ 61–68.

[81] *Id.* at 18–19, ¶¶ 62–65.

[82] *Id.* at 19, ¶ 66.

[83] *Id.*

of law because (1) there is no evidence that the Howeys had a prospective economic relationship that could have been interfered with, (2) the evidence shows that Sitka Sound was not obligated to process or ship bait herring for the Howeys in 2021, and (3) the evidence shows that Sitka Sound had "no plan to purchase bait herring from [the Howeys] for totally independent business reasons."[84]  In support of these arguments, Plaintiffs refer to a declaration by AGS Officer and Vice President Leauri Moore, who denies that AGS processes bait herring, "has [any] involvement with the bait herring fishery in Alaska," or "dictate[s] to Sitka Sound whether and how to operate its bait herring operations."[85]  Moore further testifies that AGS inquired about Sitka Sound's interest in purchasing bait herring from Defendants in 2021, but Sitka Sound "responded that it was not interested in accepting additional deliveries from [the Howeys]."[86]  This testimony is corroborated by a declaration by Sitka Sound Plant Manager William Grant, who testifies that Sitka Sound was "not interested in purchasing any more bait herring from [the Howeys]" after 2019 because the fish Defendants delivered that year were "underweight and very poor quality."[87]

Defendants respond that summary judgment on their intentional interference counterclaim is not appropriate because Plaintiffs wrongfully disrupted the Howeys' "expectancy of bait herring revenue."[88]  Defendants' theory appears to be that Plaintiffs persuaded Sitka Sound to give the Howeys' bait herring fishing opportunity to Brad Haynes, another fisher in the AGS fleet who was having trouble keeping up with his loan obligations.[89] Defendants assert that AGS wanted Haynes to have this opportunity because it was worried that Haynes and his family's boats would leave the AGS fleet if his debt could not be managed.[90]  In support of this argument, Defendants submit evidence indicating that Haynes did not obtain any bait herring permits before 2021, and that AGS's competitors were

---

[84] Docket 148 at 18–19.
[85] Docket 150 at 2, ¶¶ 4–5.
[86] Id. at 2–3, ¶ 6.
[87] Docket 151 at 3, ¶ 7.
[88] Docket 163 at 8.
[89] Id. at 7–8.
[90] Id. at 9.

"aggressively pursu[ing]" the Haynes group to join their fleets while AGS was trying to figure out a solution to Haynes' debt woes.[91]

In reply, Plaintiffs contend that Sitka Sound's decision to contract with Haynes for bait herring in 2021 was "wholly separate" from Sitka Sound's decision not to work with the Howeys that year, and that, in any case, the former decision did not interfere with any "actual prospects" the Howeys had.[92] Plaintiffs maintain that the facts that the Howeys wished to harvest bait herring and had done so a few times before "did not entitle [them] to future contracts, and there is no evidence that this was contemplated by Sitka Sound or anyone else."[93] Furthermore, Plaintiffs argue, even if the Howeys had a legitimate business expectancy in the bait herring fishing opportunity involving Sitka Sound, they cannot prove any other elements of their intentional interference claim.[94]

Assuming for purposes of argument that the Howeys had a qualifying prospective business relationship with the bait herring wholesaler or Sitka Sound,[95] the Court finds that Defendants have failed to show that a genuine issue of material fact exists as to the causal link between Plaintiffs' actions and the Howeys' loss of the bait herring fishing opportunity. The fourth and fifth elements of an intentional interference claim require the plaintiff to demonstrate that the defendant's interference caused the plaintiff to suffer a pecuniary loss,

---

[91] *Id.* at 8; Docket 156-2 at 1; Docket 164-2 at 5.
[92] Docket 171 at 10 (emphasis omitted).
[93] *Id.*
[94] *Id.* at 11.
[95] To satisfy the first element of an intentional interference claim, a plaintiff must show that they had a "continuing business or customary relationship" or a "prospective business or contractual relations[hip] which, absent interference, would culminate in pecuniary benefit to the plaintiff." *Ellis*, 686 P.2d at 707. The plaintiff's prospects of entering into such a relationship must be "reasonable and legitimate." *Id.* Although Defendants' Countercomplaint alleges intentional interference with the Howeys' relationship with the wholesaler, Defendants do not correct Plaintiffs' apparent assumption that the interference was actually with the Howeys' relationship with Sitka Sound. *See* Docket 148 at 18–19; Docket 163 at 7–9. Notwithstanding this ambiguity, the Court notes that aside from the fact that the Howeys engaged in the bait herring fishery from 2017 to 2019 and entered into agreements with Sitka Sound to process the bait herring they caught in those years, Defendants offer no evidence to support that they had a qualifying relationship with either entity. The Howeys may have hoped that Sitka Sound would agree to process bait herring for them in 2021, as Sitka Sound had done before. But given that this hope was undisputedly one-sided, any prospects the Howeys had of entering into a bait herring processing agreement with Sitka Sound in 2021 were not reasonable or legitimate.

R&R on Pls.' MSJ re Counterclaims                                        13
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR    Document 193    Filed 08/16/24    Page 13 of 21

which requires proof of what the defendant did to interfere and that the interference caused damages.[96]  Here, the undisputed evidence is that Sitka Sound lost interest in processing "any more" bait herring from the Howeys after its experience working with the Howeys in 2019.[97]  Even if Plaintiffs ultimately convinced Sitka Sound to give the 2021 bait herring fishing opportunity to Haynes, as Defendants suggest, this fact does not contradict the evidence that Sitka Sound had already decided not to work with Defendants for an entirely different and legitimate reason.[98]  Thus, Plaintiffs' alleged acts done for the benefit of Haynes did not cause the Howeys to lose the bait herring fishing opportunity because the evidence demonstrates that opportunity was not available to them.  Defendants identify no other acts that might have affected Sitka Sound's decision not to process bait herring for the Howeys in 2021.

The Court therefore recommends granting Plaintiffs' motion for summary judgment on Defendants' intentional interference counterclaim.

### C.  Plaintiffs Are Entitled to Summary Judgment on Defendants' UTPA Counterclaim.

The Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce."[99]  The UTPA provides a private right of action by "person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful [under the UTPA]."[100]  To establish a prima facie case of unfair or

---

[96] *See J & S Servs. v. Tomter*, 139 P.3d 544, 551 (Alaska 2006); *Oaksmith v. Brusich*, 774 P.2d 191, 198 (Alaska 1989).

[97] Docket 151 at 3, ¶ 7.

[98] *See Ellis*, 686 P.2d at 708 ("The only act of [defendant's] which 'interfered' with [plaintiff's] prospective advantage was [defendant's] decision not to purchase [plaintiff's] terminal on [plaintiff's] terms. This 'arms-length' dealing is not the type of conduct proscribed by the tort. . . . A party who backs away from a developing economic relationship cannot be held liable in tort for inducing himself to sever the relationship.").

[99] AS 45.50.471(a); *see also Donahue v. Ledgends, Inc.*, 331 P.3d 342, 353 (Alaska 2014) (noting that UTPA was "designed to meet the increasing need in Alaska for the protection of consumers as well as honest businessmen from the depredation of those persons employing unfair or deceptive trade practices" (citations omitted)).

[100] AS 45.50.531(a); *accord Alaska Interstate Const., LLC v. Pac. Diversified Invs., Inc.*, 279 P.3d 1156, 1162 (Alaska 2012).

R&R on Pls.' MSJ re Counterclaims                          14
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR     Case No. 3:22-cv-00027-SLG-KFR     Document 193     Filed 08/16/24     Page 14 of 21

deceptive acts or practices under the UTPA, a plaintiff must prove two elements: "(1) that the defendant engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred."[101]  To satisfy this second element, the plaintiff must show that the defendant's acts and practices "ha[d] the capacity or tendency to deceive."[102]

Defendants allege that Plaintiffs violated the UTPA by failing to repair Defendants' skiff with a remanufactured engine as agreed.[103]  Defendants allege that they authorized AGS to install a remanufactured engine, but that AGS instead installed an engine made of "old used parts" that had to be replaced, resulting in significant delays that prevented the Vessel from operating.[104]  Defendants allege that AGS's actions constitute a violation of the UTPA's prohibition of the "representation that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, secondhand, or seconds."[105]

Plaintiffs argue that there is no evidence that AGS entered into an agreement with Defendants in which it warranted the condition of the replacement parts for the engine, and that Defendants' understanding that the engine would be "remanufactured" does not violate the UTPA.[106]  Plaintiffs further contend that to the extent Defendants' UTPA claim arises from a belief that Plaintiffs in bad faith included an "illegal" registration requirement as a term of the Liberty Loan agreement, this claim cannot be sustained.[107]  Plaintiffs explain that in response to an interrogatory, Bryan Howey stated that part of the factual basis for Defendants' UTPA counterclaim was that the Liberty Note unlawfully required him to register and maintain

---

[101] *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534 (Alaska 1980).

[102] *Kenai Chrysler Ctr., Inc. v. Denison*, 167 P.3d 1240, 1255 (Alaska 2007).  Intent to deceive is not required. *ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Elec. Ass'n, Inc.*, 267 P.3d 1151, 1159 (Alaska 2011).

[103] Docket 75 at 16–17, 29, ¶¶ 55–57, 113.

[104] *Id.* at 14, 16, ¶¶ 46–48, 56.

[105] *Id.* at 17, ¶ 57.

[106] Docket 148 at 20.

[107] *Id.* at 21–22; *see also* AS 45.40.471(b)(14) (prohibiting the "represent[ation] that an agreement confers or involves rights, remedies, or obligations that it does not confer or involve, or that are prohibited by law").  Although Defendants' Answer contained a "den[ial] that there was a legal obligation to register the vessel in Washington[,]" their Counterclaim did not reference the registration requirement at all.  *See* Docket 75 at 2, ¶ 3.2.

R&R on Pls.' MSJ re Counterclaims                    15
*Kanaway Seafoods, Inc. v. Pacific Predator*
Case 3:22-cv-00027-SLG-KFR     Document 193     Filed 08/16/24     Page 15 of 21

registration of the Vessel in Washington.[108]  Plaintiffs assert that this claim was not adequately pled in Defendants' Counterclaim, but that even if it had been, the vessel registration requirement was not illegal and was inconsequential because Bryan Howey failed to comply with the requirement and "operated the [V]essel in Alaska as planned."[109]

In response, Defendants appear to abandon their UTPA claim premised on the condition of the engine AGS installed when repairing Defendants' skiff.[110]  Defendants instead focus on the Liberty Note's vessel registration requirement, arguing that federal regulations required the Vessel to be registered in Alaska, not Washington, because Alaska was the Vessel's "state of principal operation."[111]  Therefore, according to Defendants, the vessel registration requirement was "legally impossible to comply with" and could not have served as the basis for a default on the Liberty loan.[112]

In reply, Plaintiffs reject Defendants' argument that the vessel registration requirement was "impossible" and "illegal," insisting that "vessels may be registered in Washington and fish in Alaska without issue."[113]  More importantly, Plaintiffs add, the implications of requiring the Vessel's registration in Washington as opposed to Alaska are immaterial because it was not the only basis for Defendants' default on the Liberty Note: Defendants also failed to repay the loan and failed to register the Vessel in Liberty's name, instead registering the Vessel in the name of AWE—a mushroom-harvesting company—"for the sole purpose of evading creditors."[114]

Defendants fail to rebut Plaintiffs' showing that there is no genuine issue of material fact relevant to Defendants' UTPA counterclaim and that the counterclaim fails as a matter of law.  First, as to Defendants' original counterclaim premised on the condition of replacement parts for the engine repair, Defendants have produced no evidence (and made no argument) to counteract Plaintiffs' showing that Defendants lack evidence to carry their ultimate burden

---

[108] Docket 148 at 21.
[109] *Id.* at 22.
[110] *See* Docket 163 at 9–12.
[111] *Id.* at 10–11.
[112] *Id.* at 11–12.
[113] Docket 171 at 13.
[114] *Id.* at 13–14 (emphasis omitted).

1    of persuasion for this counterclaim at trial.[115]

2          Second, to the extent that Defendants adequately alleged a UTPA counterclaim

3    premised on the Liberty Note's vessel registration requirement, the counterclaim lacks legal

4    merit.[116]  The UTPA contains two sections: (1) one that defines specific acts or practices that

5    constitute UTPA violations, and (2) a catchall that generally prohibits "[u]nfair methods of

6    competition and unfair or deceptive acts or practices in the conduct of trade or commerce."[117]

7    Regardless of which of these sections Defendants intend to rely on, the Court finds that

8    Defendants' alleged conduct in including the purportedly unlawful vessel registration term in

9    the Liberty Note does not rise to the level of an unfair trade practice under Alaska law.

10          Even assuming that Defendants could not legally have complied with the vessel

11   registration term, the Court is unaware of any authority suggesting that the mere inclusion of

12   an unenforceable term in a contract is sufficient to subject the drafter to UTPA liability.[118]  In

13   analyzing UTPA claims, Alaska courts "focus on the unfairness of the disputed practice under

14   the specific circumstances presented," and may consider the following three factors:

---

15   [115] *See Nissan Fire & Marine Ins.*, 210 F.3d at 1102–03.

16   [116] As Plaintiffs correctly note, Defendants did not indicate in the Countercomplaint that their UTPA
     counterclaim was based on the purported illegality of the Liberty Note's vessel registration requirement.
17   Rather, Defendants explicitly based their UTPA claim on Plaintiffs' representation of the condition of
     the engine installed in Defendants' skiff.  *See* Docket 75 at 16–17, 29, ¶¶ 55–57, 113.  By failing to
18   identify any facts or specific statutory provisions pertaining to a UTPA counterclaim based on the
     vessel registration requirement, Defendants' Countercomplaint failed to give Plaintiffs fair notice of
19   what is now the sole basis for this counterclaim, even under the Federal Rules' liberal notice pleading
     standard.  *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1086 (9th Cir. 2019) ("[Federal
20   Rule of Civil Procedure] 8's liberal notice pleading standard . . . requires that the allegations in the
     complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it
21   rests.'" (quoting *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006))); *Bell Atl. Corp. v.
     Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement
22   to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a
     cause of action will not do." (internal quotation marks and alterations omitted)).  Although the Court
23   will consider the merits of Defendants' newly asserted UTPA counterclaim, it observes that "summary
     judgment is not a procedural second chance to flesh out inadequate pleadings."  *Wasco Prods., Inc. v.
24   Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d
     20, 24 (1st Cir. 1990)).
25   [117] *See* AS 45.50.471(a)–(b); *Kenai Chrysler Ctr.*, 167 P.3d at 1255.
     [118] Defendants do not identify any facts beyond the inclusion of the purportedly unlawful registration
26   requirement that bear on their UTPA counterclaim.

27

28
     R&R on Pls.' MSJ re Counterclaims                    17
     *Kanaway Seafoods, Inc. v. Pacific Predator*

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).[119]

With this standard in mind, no reasonable factfinder could find a violation of the UTPA based solely on the vessel registration requirement. At most, the evidence suggests that the parties agreed on the terms of the Liberty loan and that Defendants later realized that they could not comply with the vessel registration term.[120] But Defendants do not dispute that their failure to register the Vessel in Washington was not the sole or even the primary basis for their default on the Liberty loan. In short, no harm appears to have resulted from the term's inclusion and the inclusion of the term itself was not an inherently unfair or deceptive act that might give rise to UTPA liability.

The Court therefore recommends granting Plaintiffs' motion for summary judgment on Defendants' UTPA counterclaim.

### D. The Court Declines to Reopen Discovery on the Existing Record or to Deny Summary Judgment Based on the Curran Declaration.

Finally, the Court addresses the various discovery issues raised in Defendants' brief in opposition to the Motion, as well as Defendants' recently filed declaration by Melissa Curran.

First, Defendants request that the Court reopen discovery so that they can gather (1) evidence pertaining to transfers of funds made between AGS and Liberty in connection with Defendants' loans and (2) Plaintiffs' internal communications regarding Haynes, Bryan Howey, and bait herring.[121] The Court has already denied two motions by Defendants to reopen discovery. On April 18, 2024, the Court denied Defendants' motion to

---

[119] *ASRC Energy Servs. Power & Commc'ns*, 267 P.3d at 1159 (quoting *O'Neill Investigations,* 609 P.2d at 535); *see also id.* at 1164 (reaffirming use of these factors when evaluating UTPA claim).

[120] To the extent that the vessel registration term was unlawful, there is no apparent reason why Defendants could not have identified and raised this issue with Plaintiffs before agreeing on the final terms of the loan.

[121] Docket 163 at 14.

reopen discovery in this case, finding that Defendants had not diligently conducted discovery or shown good cause for their failure to do so.[122]  Observing that the parties' filings left some uncertainty as to the status of fact discovery, the Court directed the parties to file a properly supported motion if they wished to take any additional fact discovery in this case.[123]  Defendants later filed such a motion, but the Court denied it on August 16, 2024, finding that reopening discovery was not appropriate for similar reasons as those underlying its previous order, including Defendants' lack of diligence.[124]

Defendants' briefing in opposition to the present Motion likewise fails to establish that the Court should broadly reopen fact discovery and delay ruling on the Motion.  The Court's previous findings concerning Defendants' diligence in conducting discovery in this case apply with the same force here, and Defendants' unspecific and unpersuasive discovery complaints do not warrant denial of or delay in ruling on the Motion.  In addition, none of the evidence Defendants seek would affect the Court's recommendations as set forth above.[125]

Second, on May 15, 2024, Defendants filed a declaration by Melissa Curran, a former AGS employee, along with several attached exhibits.[126]  Defendants did not indicate that they wished this declaration to be considered with their opposition to the Motion.  To the extent Defendants intend the declaration and exhibits to support their opposition to any of Plaintiffs'

---

[122] Docket 175.

[123] *Id.* at 14.

[124] Docket 192.

[125] *See* Fed. R. Civ. P. 56(d); *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 679 (9th Cir. 2018) (affirming denial of Rule 56(d) motion to delay decision on summary judgment and permit additional discovery where moving party failed to show that "the information sought would . . . illuminate the determinative inquiry" on summary judgment).  For example, Defendants ask for the opportunity to depose Moore and Grant, who were not identified in Plaintiffs' final witness list, so that Defendants can determine "who at AGS supposedly asked Grant if Howey could fish herring for SSS."  Docket 163 at 3; *see also* Docket 122.  Although Plaintiffs offer no justification for their failure to identify Moore and Grant as witnesses, *see* Fed. R. Civ. P. 26(a)(1)(A)(i), (e), the information Defendants seek would not affect the Court's disposition of Defendants' intentional interference counterclaim.  *Cf. Edwards v. Permobil*, Inc., No. CV 11-1900, 2013 WL 12230856, at *1 (E.D. La. Aug. 9, 2013) (denying motion to exclude two witnesses' testimony where these witnesses were not identified on witness list, based in part on moving parties' failure to show prejudice).  To eliminate any risk of prejudice in other contexts, however, the Court will allow Defendants the opportunity to depose Moore or Grant before trial, if Defendants so wish.

[126] Docket 179.

pending motions for summary judgment, including the present Motion, these documents are late and Defendants did not file a motion asking the Court to accept the untimely filing.[127] The Court has nevertheless reviewed the declaration and attached exhibits and has determined that these documents do not change the Court's recommendations and reasoning for those recommendations.

## IV.   CONCLUSION

The Court concludes that summary judgment in Plaintiffs' favor is appropriate as to Defendants' intentional interference and UTPA counterclaims, but not as to Defendants' conversion counterclaim. Accordingly, the Court recommends that Plaintiffs' Motion for Summary Judgment at Docket 148 be **GRANTED in part and DENIED in part**, and that the Seventh and Tenth Causes of Action in Defendants' Counterclaim at Docket 75 be **DISMISSED**.

DATED this 16th day of August, 2024, at Anchorage, Alaska.



KYLE F. REARDON
United States Magistrate Judge
District of Alaska

## NOTICE OF RIGHT TO OBJECT

Under 28 U.S.C. § 636(b)(1), a district court may designate a magistrate judge to hear and determine matters pending before the Court. For dispositive matters, a magistrate judge reports findings of fact and provides recommendations to the presiding district court judge.[128]

---

[127] *See* L. Civ. R. 7.2(b)(1) (setting forth deadlines to file oppositions to summary judgment motions); 7.3(j) ("A document may be filed after the time for filing has lapsed only by leave of the court.").
[128] 28 U.S.C. § 636(b)(1)(B).

A district court judge may accept, reject, or modify, in whole or in part, the magistrate judge's order.[129]

A party may file written objections to the magistrate judge's order within 14 fourteen days.[130]  Objections and responses are limited to five (5) pages in length and should not merely reargue positions previously presented.  Rather, objections and responses should specifically identify the findings or recommendations objected to, the basis of the objection, and any legal authority in support.  Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the district court's judgment.[131]

---

[129] *Id.* § 636(b)(1)(C).
[130] *Id.*
[131] *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).